

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NORMAN P. LUPESCU,

      Plaintiff,

      v.

MICHAEL CHERTOFF, SECRETARY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,
TRANSPORTATION SECURITY
ADMINISTRATION,

      Defendant.

07CV4821
JUDGE GOTTSCHALL
MAG. JUDGE BROWN

Plaintiff Demands Trial By Jury

### COMPLAINT

NOW COMES Plaintiff NORMAN P. LUPESCU, through his counsel, KURTZ LAW OFFICES, LLC, and complaining against Defendants MICHAEL CHERTOFF, SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, TRANSPORTATION SECURITY ADMINISTRATION states as follows:

### INTRODUCTION

1.    Plaintiff NORMAN P. LUPESCU, a United States citizen who served in the Vietnam War, desired to serve his country again by working for Defendant TRANSPORTATION SECURITY ADMINISTRATION ("TSA"). However, during his tenure as a TSA Lead Security Screener, Plaintiff encountered racial discrimination, retaliation, and disability discrimination. Accordingly, Plaintiff seeks redress for racial discrimination by Defendants in violation of his rights as

secured under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (2006) ("Title VII") (Count I); for retaliation by Defendants in violation of his rights as secured under Title VII (Count II); and for disability discrimination in violation of his rights as secured under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-794 (2006) ("Rehabilitation Act") (Count III).  Plaintiff seeks declaratory and injunctive relief as well as damages for his injuries.

### Jurisdiction and Venue

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343 and 1346.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

3.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c) and (e) because Plaintiff and all Defendants either reside in this district or have their principal place of business in this district, and all events giving rise to Plaintiff's claims occurred within this district.

### Administrative Proceedings

4.     On or about November 12, 2003, Plaintiff filed a formal complaint with Defendant Transportation Security Administration's Office of Civil Rights, Case No. TSAF 03-1056.  The Department of Homeland Security Office for Civil Rights and Civil Liberties issued a Final Decision on May 31, 2007, which included a 90-day notice of right-to-sue.

5.     Plaintiff has timely filed this Complaint within 90 days of the issuance of the Transportation Security Administration's Final Decision.   Plaintiff has

timely, fully, and completely exhausted all administrative remedies and prerequisites to the filing of this Complaint.

### Parties

6.   Plaintiff NORMAN P. LUPESCU ("Lupescu") is a United States citizen and a resident of Cook County, Illinois.

7.   Defendant MICHAEL CHERTOFF is the Secretary of Defendant UNITED STATES DEPARTMENT OF HOMELAND SECURITY, a cabinet-level federal Department and a unit of the federal government.

8.   Defendant TRANSPORTATION SECURITY ADMINISTRATION is an administrative agency of the U.S. Department of Homeland Security formed in the immediate aftermath of the events of September 11, 2001 and charged with overseeing the security of federal highways, railroads, buses, mass transit systems, airports, and ports.  It is a unit of the federal government.

### Facts Giving Rise to This Complaint

9.   Plaintiff Lupescu was hired by Defendant Department of Homeland Security ("DHS") through its agency, Defendant TSA, on or about August 23, 2002 to serve as a Lead Security Screener.

10.   In applying for the job, Plaintiff had duly noted his disability of a traumatic brain injury in the medical application provided by the TSA.  Plaintiff's disability was caused by injuries he sustained in November 1998.

11.   On September 4, 2002, Plaintiff began his first day as a lead screener at Midway Airport in Chicago, Illinois.

12.     During Plaintiff's initial training period, other screeners evaluated Plaintiff's performance of the various duties of a lead screener. After the training and evaluation period, Plaintiff was given an examination and passed. Thus, Plaintiff completed his screener training.

13.     At all times material herein, Jerrald C. Rucker, an African American, ("Rucker") was a Supervisory Transportation Security Screener and Plaintiff's first level supervisor.

14.     At all times material herein, Kevin M. Laurent, an African American, ("Laurent") was a Screening Manager and Plaintiff's second level supervisor.

15.     At all times material herein, Arthur D. Bell ("Bell") was Assistant Security Director for Midway Airport, and Plaintiff's third level supervisor.

16.     At all times material herein, Jeanne Clark ("Clark") was the Federal Security Director of Midway Airport during the time Plaintiff was employed by TSA.

17.     Plaintiff's supervisors, including but not limited to Rucker, Laurent, and Jamie Westmoreland ("Westmoreland"), another African American and a TSA Supervisor at Midway Airport, were aware of Plaintiff's disability.

18.     His supervisors were also aware that he was a Vietnam War veteran.

19.     During his employment with the TSA, several of Plaintiff's supervisors made disparaging comments to and about Plaintiff's service in the military, in his presence.

4

20.    Plaintiff's supervisors also frequently ridiculed Plaintiff for being disabled; for example, when Plaintiff discussed with his supervisors other employees' actions or reported their conduct, supervisors would tell Plaintiff to "go take another pill."

21.    Plaintiff complained numerous times to management about the discriminatory treatment his supervisors were subjecting him to, as well as the frequent sexual harassment and other discriminatory conduct he observed.

22.    For instance, Plaintiff learned from some of his female co-workers that Laurent and another employee, Jerome Ferba, were engaging in egregious acts of sexual harassment against the female employees.   Plaintiff suggested to his co-workers that they report the sexual harassment to Bell.  Plaintiff also informed Bell about Laurent's harassment.    However, Laurent was never disciplined and Defendants did not take any remedial action to prevent Laurent from committing further acts of sexual harassment.

23.    Because of Plaintiff's complaints, his supervisors began singling him out for unwarranted discipline.

24.    Additionally, after Plaintiff complained about Laurent's sexual harassment of female employees, Laurent retaliated against Plaintiff by initiating a systematic campaign against Plaintiff that led to Plaintiff's unwarranted termination.

25.    On or about October 2, 2002, while Plaintiff was on duty, he and another screener, Daniel Osabu (who is African-American), almost collided while

simultaneously responding to a passenger situation and Plaintiff allowed Osabu to step in front of him to avoid the collision. Plaintiff courteously indicated to Osabu to pass in front of him by placing his hand lightly in the small of the Osabu's back. Supervisor Westmoreland counseled Plaintiff about this "alleged inappropriate behavior" toward another employee, without any further explanation.

26.     On or about November 3, 2002, Plaintiff reported to his supervisors that TSA employee, Dionicia Chandler, who is female and African-American, had taken a radio from an employee who had been assisting a passenger and for whom the passenger had been holding the radio. Chandler was never disciplined for the incident, but Plaintiff was counseled for his having reported Chandler's actions.

27.     On or about November 28, 2002, when two passengers set off the alarm on the walk-through security screener, Plaintiff required them to step out of line to be scanned with a hand-held device or "wanded." The two passengers reacted rudely and obnoxiously to Plaintiff and they immediately complained to Westmoreland, falsely accusing Plaintiff of being rude to them. Westmoreland refused to listen to Plaintiff or Plaintiff's explanation of the incident and refused to interview a witness who would have confirmed that it was the passengers who instigated the incident and were rude, and not Plaintiff.

28.     Plaintiff spoke to Laurent, Westmoreland's supervisor, but Laurent refused to help Plaintiff or even listen to what Plaintiff had to say. Laurent told Plaintiff he would need to speak to Westmoreland. The next day, Westmoreland issued Plaintiff an unwarranted disciplinary write-up.

6

29.    On or about January 4, 2003, Plaintiff assisted the father of a passenger by holding an item belonging to him while he escorted his daughter, who was the passenger, to the airplane. Plaintiff's actions were appropriate and consistent with the TSA standard operating policy and procedure ("S.O.P.") regarding the holding of items for non-passengers. Plaintiff was never informed that the SOP was changed or modified in any way or that the item was "prohibited" and could not be held by a TSA employee. Laurent directed Rucker to write-up Plaintiff for this incident in retaliation for Plaintiff's complaints, and Laurent told Rucker that the policy had changed, when in fact it had not.

30.    On or about February 6, 2003, Plaintiff attended a training class with other TSA employees conducted by DaRyl Rowan, the TSA's Human Resources Manager at Midway Airport. At the training, TSA's anti-harassment policies were discussed. Plaintiff complained about the sexual harassment of female employees at Midway Airport, which Plaintiff had learned of from several female co-workers and some of which he had observed.

31.    Having learned at the training class about the proper reporting procedures for such incidents, Plaintiff attempted on several occasions to formally inform Bell about the incidents. However, Bell repeatedly refused to listen at length to Plaintiff, instead merely replying that he would "get back to" Plaintiff about it but never doing so.

32.    On or about February 15, 2003, Plaintiff asked Rose Hall, an African-American and subordinate employee to Plaintiff to assist him by "wanding" a female

passenger.  In response, Hall became rude, argumentative, and refused to comply with Plaintiff's request.  To avoid any further disruption, Plaintiff obtained the assistance of another TSA female employee and advised Hall to remain at her post. Plaintiff issued a write-up to Rose Hall for insubordination, but Defendants never counseled, issued a written disciplinary notice, or in any way disciplined her over the incident, despite having issued disciplinary action against Plaintiff for similarly or less egregious alleged violations.

33.    Also on or about February 15, 2003, Plaintiff was threatened by Manager Don DeFranza after an incident involving another TSA employee.  On that date, TSA employee Theresa Sims repeatedly triggered the alarm on the metal detector while walking through it.  After this occurred several times in quick succession, Plaintiff asked what was causing the alarm to activate, whereupon TSA employee Jeremy Dortch, the person operating the controls of the detector, claimed that he had been setting the alarm off on purpose.  Plaintiff took control of the detector from Dortch and instructed Sims to walk through it again.  When Sims set off the detector's alarm, Plaintiff told her to proceed to the designated area to be wanded and Sims refused, becoming rude and disruptive.

34.    Supervisor Dionicia Chandler approached Plaintiff to find out what the problem was.  Plaintiff explained what occurred as Sims was wanded.  The wanding revealed that Sims had on her person a torch lighter, which is a prohibited item.  In response to having her lighter confiscated, Sims became more disruptive and abusive toward Plaintiff.  As a result, TSA Supervisory Transportation Officer,

Keith Johnson, took Plaintiff aside and away from Sims. However, Sims was not disciplined, and Plaintiff ended up being the person accused of using abusive language, and he was instructed to report to the manager's office. In the manager's office Don DeFranza threatened Plaintiff, stating that he would "kick [his] ass" and that he "did not like the look on [Plaintiff's] face."

35.     As a result of the incident with Sims, Defendants issued Plaintiff an unwarranted written notice of disciplinary action on or about February 16, 2003.

36.     In contrast, Sims did not receive any discipline or verbal counseling despite the fact that she had been carrying on her person a prohibited item; had repeatedly set off the metal detector alarm the previous day; and had been verbally abusive to Plaintiff.

37.     Additionally, Dortch,  a non-disabled, African American, male employee, who had never complained about Defendants' unlawful conduct, was not disciplined either, despite his having tried to cover for Sims by falsely claiming to Plaintiff and to Chandler that it had been he who was purposely activating the alarm on the metal detector.

38.     Further, on or about February 16, 2003, when Plaintiff attempted to speak to DeFranza about the previous day's events, DeFranza refused to speak with Plaintiff. However, later DeFranza falsely claimed to his superiors that Plaintiff had threatened him, when in fact the opposite was true.

39.     Also on or about February 16, 2003, Plaintiff received a "write-up" from Supervisor Brandie Rolark for allegedly failing to comply with a supervisor's

order to move over to another security lane while working, when in fact Plaintiff had not been told by any supervisor to move from the lane to which he had been assigned as per the daily duty roster.

40.     In contrast to all of the disciplinary actions Plaintiff incurred, other employees not in the same protected classifications as Plaintiff received no disciplinary counseling, write-ups from other employees, or written disciplinary notices for exhibiting the same – or worse – behavior as Plaintiff was wrongly accused of exhibiting.

41.     Gregory Tate, a non-disabled, male employee who did not ever complain internally about other employees' unlawful conduct, was frequently rude to passengers while on duty.  However, Tate was never written-up or otherwise disciplined for his rude behavior.

42.     Likewise, numerous other employees cursed or used foul language while screening passengers at Midway Airport, but they were not verbally counseled or disciplined for using such language.

43.     On or about February 19, 2003, Plaintiff complained to Bell about all of the sexual harassment and other unfair and discriminatory treatment that he and other employees had been subjected to by various managers and supervisors.

44.     Immediately after the meeting, Bell placed Plaintiff on a leave of absence pending "investigation" in retaliation for Plaintiff's having complained.

45.     On or about March 26, 2003, Plaintiff's supervisor Laurent and Clark requested to DaRyl Rowan that she take the necessary steps top fire Plaintiff.

46.    On or about April 2, 2003, Laurent and Clark signed off on a request to process Plaintiff's termination.

47.    On or about April 3, 2003, Laurent issued Plaintiff a letter of termination, and DaRyl Rowan transmitted a Request for Personnel Action to the TSA's Washington, D.C. Human Resources Office.

48.    Plaintiff, seeking the help of higher placed officials in the TSA, wrote a letter on or about April 5, 2003, outlining the unlawful and retaliatory conduct to which he and other employees had been subjected.

49.    After Plaintiff wrote his letter, Defendants altered Plaintiff's personnel file to justify their retaliatory firing.

50.    On or about November 12, 2003, Plaintiff filed a formal EEO Complaint with the TSA Office of Civil Rights.

## COUNT I
### (Title VII – Racial Discrimination)

51.    Plaintiff incorporates and realleges by reference paragraphs 1 through 50 above as though fully set forth herein.

52.    The actions of Defendants, as perpetrated by their agents and as described and complained of above, are unlawful employment practices in that they likely have the effect of discriminating against, depriving and tending to deprive equal employment to, and otherwise adversely affecting Plaintiff because of his race (Caucasian), in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

53.     Defendants have engaged in a policy, pattern, and practice of discrimination based on race.

54.     Defendants intentionally subjected Plaintiff to unequal and discriminatory treatment by creating a hostile and abusive work environment that altered the conditions of Plaintiff's employment and by knowingly failing and refusing to protect Plaintiff from those hostile and abusive conditions.

55.     Defendants intentionally discriminated against Plaintiff based on his race and denied him equal opportunities, including but not limited to: subjecting Plaintiff to a hostile work environment and harassment based on his race, subjecting him to unwarranted and disproportionate disciplinary action, and treating him differently in the terms and conditions of his employment.

56.     The actions of Defendants in intentionally engaging in and condoning harassment and racial discrimination against Plaintiff have caused Plaintiff great mental anguish, humiliation, degradation, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages.

**WHEREFORE,** Plaintiff seeks the following relief as to Count I of the Complaint:

A.     All wages and benefits Plaintiff would have received but for the discrimination, including but not limited to back pay, front pay, future pecuniary losses, and pre-judgment interest;

B.     Compensatory damages in an amount to be determined at trial;

C.     A permanent injunction enjoining Defendants from engaging in the discriminatory practices complained of herein;

D.   A permanent injunction requiring that Defendants adopt employment practices and policies in accord and conformity with the requirements of Title VII, 42 U.S.C. § 2000e *et seq.*;

E.   The Court retain jurisdiction of this case until such time as it is assured that Defendants have remedied the policies and practices complained of herein and are determined to be in full compliance with the law;

F.   An award of reasonable attorneys' fees, costs, and litigation expenses; and

G.   Such other relief as the Court may deem just or equitable.

## COUNT II
### (Title VII – Retaliation)

57.   Plaintiff incorporates and realleges by reference paragraphs 1 through 50 above as though fully set forth herein.

58.   Plaintiff was subjected to retaliatory treatment in retaliation for his complaints, including but not limited to being: subjected to harassment and a hostile work environment; subjected to unwarranted and disproportionate disciplinary action; subjected to heightened scrutiny; treated differently in the terms and conditions of his employment, and subjected to unlawful termination.

59.   Defendants have engaged in a policy, pattern, and practice of retaliating and condoning retaliation against employees who complain of racial discrimination and other unlawful conduct.

60.   By engaging in and condoning retaliatory conduct, Defendants discriminated against Plaintiff in violation of 42 U.S.C. § 2000e-3.

61.     The actions of Defendants in intentionally engaging in and condoning discrimination and retaliation against Plaintiff have caused him great mental anguish, humiliation, degradation, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages, and unlawful termination.

**WHEREFORE,** Plaintiff seeks the following relief as to Count II of the Complaint:

    A.    All wages and benefits Plaintiff would have received but for the discrimination, including but not limited to back pay, front pay, future pecuniary losses, and pre-judgment interest;

    B.    Compensatory damages in an amount to be determined at trial;

    C.    A permanent injunction enjoining the Defendants from engaging in the discriminatory practices complained of herein;

    D.    A permanent injunction requiring that the Defendants adopt employment practices and policies in accord and conformity with the requirements of Title VII, 42 U.S.C. § 2000e *et seq.*;

    E.    The Court retain jurisdiction of this case until such time as it is assured that Defendants have remedied the policies and practices complained of herein and are determined to be in full compliance with the law;

    F.    An award of reasonable attorneys' fees, costs, and litigation expenses; and

    G.    Such other relief as the Court may deem just or equitable.

## COUNT III
### (Rehabilitation Act – Disability Discrimination)

62.     Plaintiff incorporates and realleges by reference paragraphs 1 through 50 above as though fully set forth herein.

14

63. Plaintiff suffers from traumatic brain injury, for which he takes medication. Said injury severely limits Plaintiff in one or more major life activities, including but not limited to his ability to concentrate, to sleep, to read, his short term memory, and loss of smell.

64. Accordingly, Plaintiff suffers from a disability, perceived disability, and/or record of disability under the Rehabilitation Act, 29 U.S.C. § 705(20).

65. Defendants have engaged in a policy, pattern, and practice of discrimination based on disability.

66. Defendants' agents and supervisors treated Plaintiff differently than other employees and in a discriminatory manner because of his disability.

67. Defendants through their agents and supervisors intentionally subjected Plaintiff to unequal and discriminatory treatment that altered the terms and conditions of Plaintiff's employment.

68. The actions of Defendants in intentionally engaging in and condoning disability discrimination against Plaintiff have caused Plaintiff great mental anguish, humiliation, degradation, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages.

**WHEREFORE,** Plaintiff seeks the following relief as to Count III of the Complaint:

A. All wages and benefits Plaintiff would have received but for the discrimination, including pre-judgment interest;

B. Compensatory damages in an amount to be determined at trial;

C.  A permanent injunction enjoining Defendant from engaging in the discriminatory practices complained of herein;

D.  A permanent injunction requiring Defendant to adopt employment practices and policies in accord and conformity with the requirements of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-794;

E.  A declaratory judgment that Defendant's actions violate Rehabilitation Act of 1973, 29 U.S.C. §§ 701-794 (2006);

F.  That this Court retain jurisdiction of this case until such time as it is assured that Defendant has remedied the policies and practices complained of herein and is determined to be in full compliance with the law;

G.  An award of reasonable attorneys' fees, costs, and litigation expenses; and

H.  Such other relief as this Court may deem just or equitable.


Respectfully submitted,

NORMAN P. LUPESCU


Attorney for Plaintiff


Dana L. Kurtz, Esq. (6256245)
John C. Chadwick, Esq. (6291462)
KURTZ LAW OFFICES, LLC
414 South State Street
Lockport, Illinois 60441
Phone: 815.838.0968
Facsimile: 312.893.2239
E-mail: dkurtz@kurtzlaw.us
E-mail: jchadwick@kurtzlaw.us