UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NORMAN P. LUPESCU, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 C 4821 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| JANET NAPOLITANO, Secretary, United | ) | |
| States Department of Homeland Security, | ) | |
| Transportation Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Defendant Transportation Security Administration ("TSA") employed Plaintiff Norman P. Lupescu at Chicago Midway Airport for seven months before terminating him. Subsequently, Lupescu brought this employment discrimination suit, alleging that that TSA engaged in unlawful racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. §2000e *et seq.* (2006). This matter is presently before the court on TSA's motion for summary judgment. For the reasons stated within, the court denies TSA's motion.

## I. FACTUAL BACKGROUND

### A. Evidentiary issue

First, the court must resolve the admissibility of certain records regarding Lupescu. These records largely consist of TSA forms, each captioned "Record of Conduct" or "Counseling Form," but referred to collectively throughout this opinion as Lupescu's "records." (*See* Def.'s Exs. 5-12.) These records are generally first-person accounts of Lupescu's allegedly improper conduct written by Lupescu's superiors who

witnessed the conduct; the records are supplemented in certain instances by Lupescu's versions of the events in question.

"Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The evidence need not be admissible in form–affidavits and deposition transcripts inadmissible at trial nevertheless may be considered for purposes of summary judgment–but must be so in content. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994). Lupescu contests the authenticity of TSA's records without specifically explaining how they are inauthentic. TSA submits an affidavit that satisfies the requirement that the proponent submit evidence "sufficient to support a finding that the matter in question is what its proponent claims." *See* Def.'s Exs. 4 & 36; *see also* Fed. R. Evid. 901. Lupescu's records are therefore deemed authentic for purposes of this motion.

Lupescu next argues that the records are hearsay. TSA does not contest whether the records are hearsay, and with good reason: they are classic statements not made at trial or hearing that TSA offers for the truth of the matters asserted (*i.e.*, that Lupescu engaged in the conduct recorded).[1] *See* Fed. R. Evid. 801(c). Rather, TSA argues that these are records of regularly conducted activity. Such records are admissible under Federal Rule of Evidence 803(6) if the records are made (1) are made at or near the time of the incident recorded (2) by, or from information transmitted by, a person with

---

[1] Many of the records contain written statements by Lupescu; these statements, offered by TSA, are party-opponent admissions, admissible as non-hearsay. *See* Fed. R. Evid. 801(d)(2)(A). But in those statements, Lupescu largely denied that he engaged the conduct subjecting him to discipline, and so his statements are not the real nub of the parties' dispute. Rather, Lupescu's objection centers on other TSA employees' accounts, as reflected in the records, of the conduct that subjected Lupescu to discipline.

knowledge (3) pursuant to the regular practice of a regularly conducted business activity and (4) are kept in the course of a regularly conducted business activity. Fed. R. Evid. 803(6). This exception to the hearsay rule contemplates that each of the above requirements be "shown by the testimony of the custodian [of the records] or other qualified witness . . . ." *Id.*

The Seventh Circuit has alternately found disciplinary records admissible and inadmissible; as with many evidentiary disputes, the outcome depends on the foundation laid for the admission of the evidence in question. *See Coates v. Johnson & Johnson*, 756 F.2d 524, 549 (7th Cir. 1985); *see also Pierce v. Atchison Topeka & Santa Fe Ry. Co.*, 110 F.3d 431, 444 (7th Cir. 1997). TSA asserts without citation that the forms on which the records are kept "have been regularly used since TSA's inception," and attaches an attestation that the records are "kept in the ordinary course of the Transportation Security Administration's business . . . ." (*See* Def.'s Ex. 4, at ¶ B.) A review of the records further reveals that they were created at or near the time of the events recorded–no record post-dates the event it memorializes by more than two days– and were recorded first-person, that is, by a person with knowledge of the event recorded. (*See* Def.'s Exs. 5-12.)

But TSA provides no affidavit attesting that its regular practice was to make these records. Even if this court believed that the records were made as a regular practice–a fact that is far from clear, given that each report appears to stem from a unique and irregular incident, and reports vary in form–that belief would be no substitute for a foundation supported by affidavit. *See Collins v. Kibort*, 143 F.3d 331, 337-38 (7th Cir. 1998). While the evidence produced at summary judgment need not be of the exact form

necessary to be admissible at trial, *see Winskunas*, 23 F.3d at 1267-68, TSA has failed at this point to lay a sufficient foundation for the court to infer that the records at issue were regularly made and would therefore be admissible. As presently supported, TSA's records of conduct do not qualify as records of regularly conducted activity and are inadmissible for the truth of the matters asserted therein.

TSA's argument that Lupescu "inexplicably" attempts to use similar records of conduct in his response fails in two respects. First, unlike Lupescu, TSA did not object to the admission of the records put forth by Lupescu, and the court will not construe an argument in reply as an objection. (*See* Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ¶¶ 54, 57.[2]) Second, even assuming that the court has an independent duty to assess the admissibility of the documents on which Lupescu relies, *see McLaury v. Duff & Phelps, Inc.*, 691 F. Supp. 1090, 1096 n.2 (N.D. Ill. 1988), the statements contained in those reports are largely by TSA employees and agents and so, when offered by Lupescu, are admissions of a party opponent, admissible as non-hearsay. *See* Fed. R. Evid. 801(d)(2)(A).[3]

**B.      Background**

While the parties contest many of the material facts, the facts below are uncontested unless otherwise noted and, where contested, stated in the light most favorable to Lupescu, the non-moving party.

TSA began screening at Midway Airport in 2002 and, to facilitate screening operations, hired hundreds of new employees. (*See* Def.'s Resp. to Pl.'s Stmt. of Add'l

---

[2]      Citations to a party's response to a statement of fact are to the response, the original statement, and to the documents cited in each.

[3]      Lupescu's statements in those records of conduct, admissible when offered by TSA, are not so when offered by Lupescu himself.

Facts ¶ 21.) Lupescu was one such employee, and began working for TSA at Midway Airport on August 23, 2002 as a lead transportation security screener (a "lead screener"). (*See* Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 1.)

Lupescu's responsibilities as a lead screener included overseeing a screening checkpoint and determining job assignments for the screeners he supervised. (*Id.* ¶ 3.) TSA considered lead screeners to the equivalent to screeners for staffing purposes, as lead screeners had to perform the functions of screeners. The two positions were subject to the same disciplinary policies and performance standards. However, lead screeners were paid more than screeners, had some additional responsibilities, and occasionally supervised screeners. (*See* Pl.'s Ex. 4, at 10-13, 108.)

Like all new employees, Lupescu began a twelve-month probationary period when he started work. (*See* Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 1.) The same general disciplinary policy applied to all employees, including supervisors and managers. (*See* Pl.'s Ex. 9, at 67.) But TSA policy had certain provisions that applied only to probationary employees that specifically provided that "An employee may be terminated . . . at any time during the probationary period," provided "a supervisor determines that an employee's performance or conduct is deficient and the problem cannot be corrected . . . ." (Def.'s Ex. 3 ¶ 5(g).)

**C.    Lupescu's supervisors**

As a lead screener, Lupescu, who is white, reported to supervisory transportation security screeners ("supervisors"), including Jerrold Rucker, Jamie Westmoreland, Brandi Rolark, and Dionicia Chandler, all of whom are African-American. (Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 4; Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ¶ 22.) Supervisors

then reported to screening managers ("managers") who included Kevin Laurent, who is African-American, and Don DeFranza, who is white. (Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ¶ 22; *see also* Pl.'s Ex. 1, at 15-16.) At relevant times, managers reported to Arthur Bell, the Assistant Federal Security Director for Screening, who is white and who in turn reported to the Federal Security Director, Jeanne Clark, whose race the parties have not indicated. (*See* Pl.'s Resp. to Def.'s Stmt. of Facts ¶ 4.)

### D.     Lupescu's performance and discipline

TSA does not consider the records that Lupescu received to be disciplinary actions, but instead issues them for minor rules infractions. (*See* Pl.'s Ex. 4, at 50:21-51:4; *see also* Pl.'s Ex. 9, at 109:13-20.) Lupescu's employment file contains six records of conduct, although he did not receive one such record. (*See* Pl.'s Resp. to Def.'s Stmt. of Facts ¶¶ 5-10, 37, 38.) Lupescu was also counseled–an informal reprimand not amounting to a disciplinary action–at least one additional time, in February 2003, for an incident for which there are several written statements, but no more formal record. (*See id.* ¶ 11.) TSA did not take any formal disciplinary actions against Lupescu before February 19, 2003, when he was placed on administrative leave, then eventually terminated. (*See* Pl.'s Resp. to Def.'s Stmt. of Add'l Facts ¶ 24.)

Given the inadmissibility at this point of the records of conduct for the truth of the matters stated therein, the court is left to piece together Lupescu's performance and discipline from other evidence. TSA has primarily relied on those inadmissible records of conduct, meaning the remaining evidence was largely produced by Lupescu. In many instances, Lupescu agrees with–and the record supports–some version of the events described in the records of conduct.

On October 2, 2002, Lupescu touched a screener on the screener's back without that screener's consent; Lupescu testified that he touched the screener to avoid a collision. (*See* Def.'s Ex. 2, at 91.) One month later, Lupescu accused a TSA supervisor of stealing a radio from another airport employee, and the evidence suggests that the supervisor did in fact take the radio. (*See* Pl.'s Ex. 2, at 105.) On approximately November 28, 2002, an incident occurred involving a confrontation between Lupescu and a passenger that then escalated, leading to a manager's involvement. (*See id.*, at 94-95.) Each of these incidents resulted in a record regarding Lupescu's conduct.

Despite these records of conduct, managers DeFranza and Laurent signed an Employee Performance Assessment for Lupescu dated December 9, 2002, that stated that Lupescu "met or exceeded the standard for satisfactory performance." (*See* Pl.'s Ex. 12.) The form contains several typed "Individual Goal(s);" it is unclear whether the managers' signatures indicated that Lupescu was meeting these goals, and the form has no further comments, positive or negative, from the managers regarding Lupescu. (*See id.*) Laurent and Bell each told Lupescu that he was doing a good job. (Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ¶¶ 33, 34.)

Soon, though, Lupescu and his TSA superiors were at odds.[4] On January 9, 2003, Lupescu held a pocket knife for a man escorting his minor daughter to a gate for her flight; Lupescu was issued a record of conduct for the incident, but denies that he knew it was against TSA policy to hold prohibited items for persons escorting passengers to their

---

[4] Lupescu's file contains a file dated December 20, 2002 that Lupescu denies he received. (*See* Def.'s Ex. 8; *see also* Pl.'s Stmt. of Add'l Facts ¶ 37.) Lupescu stated that "that was the situation where I refused to help someone," suggesting that the incident might have happened. (Pl.'s Ex. 1, at 74.) However, Lupescu's testimony is too ambiguous to be conclusive, and the court will construe the testimony to describe the incident reported in the record of conduct, rather than the conduct itself.

gates, and the evidence is equivocal as to when TSA changed its policy to prohibit such conduct. (*See* Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ¶ 38.) On February 16, 2003, Lupescu received a record of conduct from a supervisor for an incident that allegedly occurred the day before, but which Lupescu denies and of which there is no admissible evidence. (*See id.* ¶ 10.) Lupescu referred to the record of conduct as "bullshit" and refused to sign it. (*See id.*)

On February 15, 2003, the same day as the previous alleged incident, Lupescu was involved in a separate incident involving a TSA employee named Theresa Sims. According to Lupescu, the employee passed through a detector, which went off, causing Sims to become confrontational and make a scene. (*See id.* ¶ 41.) Sims stated under oath that she did not set off the detector but that Lupescu made her go through secondary screening anyway; Lupescu told Sims that "this is what [she] got for talking so much." (Def.'s Ex. 25, at 3.) Lupescu received a record of conduct for the incident, and cursed when he received the counseling. (Def.'s Resp. to Pl.'s Stmt. of Facts ¶ 42.)

On February 19, 2003, Arthur Bell met with Lupescu then placed him on administrative leave. (*Id.* ¶ 45.) The next day, Bell began termination proceedings for Lupescu. (*Id.*) Bell made the relevant decisions in terminating Lupescu, although Kevin Laurent, the manager two levels above Lupescu, eventually signed forms that recommended Lupescu's termination and then terminated Lupescu. (Pl.'s Ex. 9, at 35-36, 132-36; *see also* Pl.'s Stmt. of Add'l Facts ¶¶ 45, 46; Pl.'s Ex. 4, at 20-24.) On April 3, 2003, TSA terminated Lupescu. (Def.'s Ex. 14.)

**E.    Lupescu's report of harassment**

Lupescu asserts that, several times before his termination, he complained of harassment and discrimination within TSA. On December 20, 2002, Lupescu spoke with Bell about sexual harassment and discrimination. In his deposition, Lupescu described the conversation as follows:

> Here was another instance of discrimination, retaliation.
>
> When I had gone to Art Bell about Kevin Laurent – I believe the first time I talked to him was on the 20th of December . . . .
>
> It was kind of brief. I had talked to him about the sexual harassment, discrimination, about the morale, basically how things were being run which was not as policy should be, the way that they taught us it should be.
>
> Again Art Bell was very busy, and we just talked. We talked just for a couple of minutes and again he said he would get back to me. And the next time I talked to him was I believe February 19.

(Pl.'s Ex. 2, at 135-36, 140-41.) Lupescu testified that he also spoke on December 20, 2002 to Laurent about harassment by Jerome Ferba, another TSA employee, of a female employee. (Pl.'s Ex. 1, at 74-75.)

On February 6, 2003, according to Lupescu's deposition testimony, he and other employees attended a compulsory "sexual harassment class" at which TSA human resources specialist DaRyl Rowan was present. (Pl.'s Ex. 2, at 136.) According to Lupescu, at that class, he and other TSA employees were instructed to report any incidents of sexual harassment to their respective managers; Lupescu asked Rowan to whom he should report if his manager was the harasser, but did not receive a response. (*Id.* at 136-37.)

Finally, on February 19, 2003, prior to his suspension and termination, Lupescu met with Bell. (Pl.'s Ex. 4, at 75.) Bell testified that to the best of his recollection, he

was "leaning" toward recommending Lupescu's termination prior to the meeting. (*Id.* at 78.) At the meeting, Lupescu complained generally of "favoritism, prejudice and discrimination . . . for racial reasons." (*See id.* at 82.) Lupescu testified that he also complained about Laurent's and Ferba's harassment of specific female TSA employees, although apparently not at length. (Pl.'s Ex. 1, at 65-66.) Bell did not initiate any complaint of discrimination, which he could have done in response to Lupescu's complaints. (Pl.'s Ex. 4, at 86.)

After this meeting, as described above, Lupescu was placed on administrative leave then, on April 3, 2003, terminated.

**F.      Discipline of other TSA employees**

In contrast to his own records of conduct, suspension, and termination, Lupescu seeks to introduce the disciplinary history of other TSA employees. Lupescu has not indicated whether any of these employees were, like he was, probationary.

1.      Kevin Laurent

Laurent, an African-American manager, acknowledged that certain female employees twice alleged that he sexually harassed them. (*See* Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ¶ 53.) The parties point to no evidence that he actually engaged in sexual harassment, and the evidence supports a finding only that two female employees complained of Laurent's harassment. Sexual harassment was a serious infraction under TSA policy, and Laurent received a letter of counseling and a reprimand as discipline. (*Id.*)

### 2. Dionicia Chandler

Dionicia Chandler was an African-American supervisor who apparently committed several infractions during her employment with TSA. Chandler was found to have slept on the job several times; made statements that suggested she preferred African-American supervisors; acted unprofessionally toward coworkers; incompetently completed a required security report; abused leave policies; and failed to follow proper screening procedures when she held a rifle for a person (apparently in similar circumstances that resulted in Lupescu holding a pocket knife). (*See generally* Pl.'s Ex. 16.) As discipline, Chandler received counseling (for sleeping), a Letter of Warning (again, for sleeping), a Leave Restriction (for abuse of leave policies); and a one-day suspension (for the rifle incident). (*Id.*) Eventually, Chandler resigned her employment with TSA.

### 3. Rose Hall

Rose Hall was an African-American screener under Lupescu. According to Lupescu, he asked Hall to "wand"–that is, to inspect using a manual device–female passengers, but Hall apparently gave Lupescu "grief;" as Lupescu stated, "She didn't want to do it because that meant she had to work." (Pl.'s Ex. 2, at 130-31.) The evidence does not reveal whether Hall refused to follow Lupescu's instructions, did so grudgingly, or how she responded beyond giving Lupescu "grief." Lupescu attempted to write up Hall for the incident, but Chandler, his supervisor, did not allow him to do so. (*Id.*) Hall was later terminated for poor attendance, insubordination, and failure to comply with standards of conduct. (*See* Def.'s Ex. 26.) There is no indication that Hall received any pre-termination discipline.

### 4. Theresa Sims

According to Lupescu, during the above-described incident on February 15, 2003, Theresa Sims, an African-American whose position is unidentified, was carrying a lighter, which Lupescu asserts was a prohibited item. (*See* Pl.'s Stmt. of Add'l Facts ¶ 56.) Sims was not disciplined. (*Id.*)

### 5. Melody Chase

Melody Chase was an African-American screener who the parties agree engaged in a wide variety of misconduct, including: repeatedly refusing to work; insubordination; repeatedly walking off her post; failing to comply with standards of conduct; failing to report to her assigned post; improper physical contact; and repeated tardiness and absences. Chase received several instances of counseling, three letters of warning, and a three-day suspension, and was eventually terminated. (*See generally* Pl.'s Ex. 17.)

### 6. General Allegations

Lupescu cites to general statements regarding employees' alleged misbehavior, specifically regarding employees who held prohibited items for other persons, who had verbal altercations with passengers, and who cursed on the job, all while not being subject to discipline. (*See* Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ¶¶ 58-60.) This testimony is equivocal and general to the point of not being probative.[5]

## II. LEGAL STANDARD

Summary judgment is warranted where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to

---

[5] This testimony is also irrelevant to Lupescu's discrimination claim because the cited testimony does not mention the races of the employees who engaged in the alleged conduct, and irrelevant to Lupescu's retaliation claim because the testimony does not indicate whether the unidentified employees engaged in protected activity similar to that asserted by Lupescu.

any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). Normal burdens of proof remain, however. If a plaintiff has failed to establish one of the elements of his case and there is no factual dispute regarding that element, then summary judgment will be entered in favor of the defendant. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006); *see also Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 892 (7th Cir. 2005) ("Summary judgment for a defendant is appropriate when a plaintiff fails to make a sufficient showing to establish the existence of an element essential to [his] case on which [he] will bear the burden of proof at trial.") (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citations and alterations omitted)). In the context of employment discrimination cases, the court must analyze an employer's assertions "with 'added rigor' before granting summary judgment." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (7th Cir. 1999) (quoting *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993)).

## III. ANALYSIS

### A. Racial discrimination

The parties agree that Lupescu pursues his racial discrimination claim by the indirect method. (*See* Mem. 7-8; *see also* Resp. 16-21.) In so doing, Lupescu proceeds under the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-02 (1973). *See McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). The *McDonnell Douglas* test requires that, to survive summary judgment, the

usual plaintiff must show that a genuine issue of material fact exists that: (1) he is a member of a protected class; (2) his job performance met his employer's expectations; (3) he suffered an adverse employment action; and (4) similarly situated persons not in the protected class were treated more favorably. *Id.*; *see also Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).

### 1.    Background circumstances

The parties dispute how to apply the first aspect of the *McDonnell Douglas* test to Lupescu's race discrimination claim: that is, how can he show that he is a member of a protected class, given that he is white?  Lupescu argues that his burden is no different from any other plaintiff's, noting that the Supreme Court has held that "Title VII prohibits racial discrimination against . . . white petitioners in this case upon the same standards as would be applicable" were the plaintiffs African-American.  *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 276 (1976).

A literal application of the *McDonnell Douglas* test would perpetually doom white plaintiffs' claims because they cannot prove (or, in this procedural context, establish a genuine issue of material fact) that they are members of a protected class.  *See Mills*, 171 F.3d at 454-55.  This is the opposite of what the *McDonald* Court intended. 427 U.S. at 276; *see also Gore v. Ind. Univ.*, 416 F.3d 590, 592 (7th Cir. 2005) (noting that "the conventional *McDonnell Douglas* framework is not very helpful for so-called reverse-discrimination cases.").

Adapting the *McDonnell Douglas* test to allow white plaintiffs to pursue reverse-discrimination claims, the Seventh Circuit has repeatedly held that a white plaintiff bringing a race-discrimination claim "must show at least one of the background

circumstances" suggesting that anti-majority discrimination has occurred, or must show that there is something "fishy" about the facts at hand. *Mills*, 171 F.3d at 456-57; *see also Farr v. St. Francis Hosp. & Health Ctrs.*, 570 F.3d 829, 833 (7th Cir. 2009). This is not an "added burden," as TSA would have it, but rather a substituted one, in recognition of a white plaintiff's inability to satisfy the first element of the traditional *McDonnell Douglas* test. *See Mills*, 171 F.3d at 455-56; *see also Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 821 (7th Cir. 2006).[6]

The question, then, is whether Lupescu has produced sufficient background or fishy circumstances suggesting that TSA discriminated against white employees. Lupescu asserts, "Most of [his] supervisors were African American, the manager who recommended his termination is African American, and there is ample evidence of more lenient treatment of African Americans and 'fishy' circumstances." (Resp. 18.) The court addresses the evidence supporting each argument in turn.

Neither party has cited particularly relevant cases–Lupescu denies that the proof of background circumstances is even necessary–and the Seventh Circuit has acknowledged that the "contours of what constitutes a background circumstance"–like the bounds of which facts are fishy–"are not precise." *Mills*, 171 F.3d at 455.

Lupescu's first circumstance is that all of his supervisors were African-American. Lupescu's superiors appear to have been primarily African-American, *see* Def.'s Resp. to

---

[6]     Lupescu argues that the recent Supreme Court case of *Ricci v. DeStefano*, 129 S. Ct. 2658 (2009) rendered *Farr*, *Mills*, and other Seventh Circuit case law "no longer good law" on the issue of the applicability of the *McDonnell Douglas* test to majority plaintiffs. (Resp. 17-18.) Lupescu's argument is unpersuasive; the Court in *Ricci* did not address a Title VII plaintiff's *prima facie* case or whether that case changes when the plaintiff is not a member of a protected class. *See generally Ricci*, 129 S. Ct. 2658.
        Lupescu also argues that the Third Circuit rejected the "background circumstances" test in *Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir. 1999). Given the above-cited uninterrupted string of Seventh Circuit cases establishing the "background circumstances" and "fishy" facts requirements, *Iadimarco* is inapposite.

Pl.'s Stmt. of Add'l Facts ¶ 22, although DeFranza, a second-level superior, was white, as was Arthur Bell, three levels above Lupescu. (Pl.'s Resp. to Def.'s Stmt. of Fact ¶ 4.) At least two courts have held that the predominance of minority supervisors, standing alone, does not establish a "background circumstance." *See Plummer v. Bolger*, 559 F. Supp. 324, 329 (D.D.C. 1983), *aff'd without op.*, 721 F.2d 1424 (D.C. Cir. 1983); *see also Heasley v. D.C. Gen. Hosp.*, 180 F. Supp. 2d 158, 171 (D.D.C. 2002). In *Mills*, the Seventh Circuit found sufficient background circumstances where "nearly all promotions at the office went to women, and at the time the challenged hiring decision was made, females dominated the supervisory positions in the relevant office." 171 F.3d at 457. However, it is not clear that, standing alone, such predominance would be sufficient.

The second background circumstance cited by Lupescu is that Laurent, an African-American manager, "recommended" that Lupescu be terminated. While there is some divergence, several courts have suggested or held that the predominance of minority decision-makers is sufficient to constitute a "background circumstance." *See Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1534-35 (10th Cir. 1995) (finding that exclusively Latino decision-makers constituted a sufficient background circumstance); *see also Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002); *Turner v. Grande Pointe Healthcare Cmty.*, 631 F. Supp. 2d 896, 911 (N.D. Ohio 2007); *Gardner v. Wayne County*, 520 F. Supp. 2d 858, 865-66 (E.D. Mich. 2007); *Tittl v. Ohio*, No. 06 C 1411, 2008 WL 731035, at *6 (N.D. Ohio Mar. 17, 2008); *but see Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997) (holding that no background circumstances where plaintiff failed to prove that *all* decision-makers were minorities).

Here, the record is ambiguous as to whether a Laurent, who is African-American, or Bell, who is white, or both, were the decision-makers with regard to Lupescu's employment. Laurent signed the form terminating Lupescu, *see* Pl.'s Ex. 15; *see also* Def.'s Ex. ¶ 18, at 35-36, 132-136, and a form stating that he "recommend[ed]" Lupescu's termination. (*See* Pl.'s Ex. 14.) But Bell, a white male and Laurent's superior, met with Lupescu and reached the decision to suspend and eventually to terminate Lupescu. (Pl.'s Stmt. of Add'l Facts ¶¶ 45, 46; *see also* Def.'s Ex. 18, at 35-36, 132-36; Pl.'s Ex. 4, at 20-24, 70-71.) According to Bell, Laurent was the decision-maker only "in the sense of signing as the official," and Laurent appeared to agree that he was not a substantive decision-maker. (Pl.'s Ex. 4, at 20; *see* Def.'s Ex. 18, at 35-36, 132-36.) Still, Laurent did attest that he recommended Lupescu's termination, and the records of conduct laying the foundation for Lupescu's termination were written primarily by African-American superiors. (*See generally* Def.'s Exs. 5-11.)

That leads to another background circumstance: without the excluded records of conduct, Lupescu's disciplinary record is remarkably thin. While TSA policy, as quoted above, made clear that probationary employees such as Lupescu could be terminated for any reason, Def.'s Ex. 3, ¶ 5, the reasons for Lupescu's termination, absent admissible evidence of his prior misconduct, are few.

There is also a fair suggestion that TSA at Midway, at least during Lupescu's time there, was a racially charged environment. Aside from Lupescu's charges, Sims accused Lupescu of being a "bigot," *see* Def.'s Ex. 25, at 3, Laurent filed an EEOC complaint against TSA, alleging discrimination based, in part, on his race, *see* Pl.'s Ex. 4, 68:2-69:8, and Dionicia Chandler, one of Laurent's supervisors, expressed a preference for the

promotion of black candidates. (*See* Pl.'s Ex. 16.) Of course, "Stray remarks made by nondecisionmakers are not evidence that the decision had a discriminatory motive." *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001); *see also Mlynczak v. Bodman*, 442 F.3d 1050, 1057-58 (7th Cir. 2006) (quoting *Crabtree* in a "background circumstance" analysis). But several accusations and stray remarks give some sense of TSA work environment.

The final "background circumstance" cited by Lupescu is TSA's allegedly "more lenient treatment of African Americans." (Resp. 18.) Even taking the facts in the light most favorable to Lupescu, the evidence is not particularly probative of anything "fishy" or any tendency within TSA to discriminate against white employees, as explained more fully in section III.A.4 within.

As the Seventh Circuit has pointed out, the "background circumstance" threshold is lower than that necessary for the discrimination claim as a whole. *Mills*, 171 F.3d at 457. A review of Seventh Circuit precedent and decisions from other courts in this district reveals that more than a headcount of supervisors may be necessary to pass this threshold. *Id.* at 457 (noting evidence of "'disproportionate hiring patterns' favoring women" in addition to predominance of female supervisors); *see also Balance v. City of Springfield*, 424 F.3d 614, 617-18 (7th Cir. 2005) (affirming that background circumstances exited when independent investigation revealed that race and gender were taken into consideration in making employment decisions); *Hague*, 436 F.3d at 822 (holding that sufficient background circumstances existed when five fired white plaintiffs were essentially replaced by black employees); *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1119 (7th Cir. 2009) (noting that discriminatory comments by decision-

makers "might" be enough to establish background circumstances); *Perry v. Cmty. Action Servs.*, 82 F. Supp. 2d 892, 895 (N.D. Ill. 2000) (finding that background circumstances existed where decision-makers were exclusively African-American and plaintiff was replaced by an African-American with "considerably less" relevant experience).

Lupescu presents his evidence of background circumstances in one sentence, without citation to case law, and with only a string citation to the record to support his claims. Yet, the predominance of African-American supervisors plus evidence of a racially charged environment and the lack of evidentiary support for Lupescu's termination create at least a genuine issue of material fact support the inference that TSA at Midway airport during the relevant period was "the unusual employer who discriminates against majority employees." *Mills*, 171 F.3d at 456-57.

### 2.    Job performance

The next question is whether Lupescu met TSA's legitimate expectations for job performance. *See McGowan*, 581 F.3d at 579. TSA chose to rely nearly exclusively on the records of conduct for which it failed to provide an adequate foundation. Lupescu points to his December 2002 favorable performance review, *see* Pl.'s Ex. 12, as well as anecdotal favorable evidence of his job performance. Without TSA's records of conduct, a question of fact remains regarding whether Lupescu was meeting TSA's legitimate expectations.

### 3.    Adverse employment action

The parties agree that Lupescu's termination was an adverse employment action sufficient to satisfy the *McDonnell Douglas* test, but disagree as to whether his suspension is also such an action. TSA asserts that any action arising from Lupescu's

suspension is barred for failure to exhaust administrative remedies. *See Gibson v. West*, 201 F.3d 990, 993 (7th Cir. 2000); *see* 29 C.F.R. § 1614.105(a). A letter from TSA to Lupescu's counsel, acknowledging receipt of his administrative complaint, notes that Lupescu alleged in that complaint that "he was terminated" based on race, disability, and retaliation, but makes no reference to his suspension. (*See* Def.'s Ex. 34). A later Notice of Right to File from TSA to Lupescu similarly notes his termination, but not his suspension. (*See* Def.'s Ex. 21.) In his response, Lupescu cites no evidence supporting his claim that he raised his suspension in his administrative complaints. Of course, a suspension without pay, which TSA appears to have given Lupescu, would be an actionable adverse employment action *if* Lupescu properly exhausted his administrative remedies with respect to that claim. *See Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). However, there is no evidence that Lupescu actually exhausted his administrative remedies with respect to his suspension. Lupescu's assertion to that effect, without more, is insufficient to survive summary judgment. *See Johnson*, 426 F.3d at 892. Therefore, Lupescu's suspension is not actionable, but his termination is.

4.      Similarly situated employees

The final question is whether Lupescu has established a genuine issue of material fact regarding the fourth element of his *prima facie* case. The parties dispute both the articulation of the fourth element of the *McDonnell Douglas prima facie* case, and the application of that element to the case at hand. Their disagreement arises in part from the difficulty of adapting *McDonnell Douglas*, a hiring case, to termination cases such as this. 411 U.S. at 802 (requiring that plaintiff show that "after his rejection, the position

remained open and the employer continued to seek applicants from persons of complainant's qualifications.").

The Seventh Circuit has repeatedly stated that the fourth element of a termination claim requires that "the employer treated similarly situated employees outside the protected class more favorably." *See Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009) (citing, *inter alia*, *McDonnell Douglas*, 411 U.S. 792); *see also Farr*, 570 F.3d at 833; *Dear v. Shinseki*, 578 F.3d 605, 609-10 (7th Cir. 2009); *McGowan*, 581 F.3d at 579. Before these cases, though, the court stated that, to support the inference of discrimination, the employee must show that the employer "'sought someone to perform the same work'" after terminating the employee. *See Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007) (quoting *Matthews v. Allis-Chalmers*, 769 F.2d 1215, 1217 (7th Cir. 1985)). In *Pantoja*, the court noted that the "similarly situated" inquiry may prove unduly rigid where the plaintiff had no similarly situated fellow employees. *Id.* Elsewhere, the court has stated that the fourth element requires that a plaintiff show that "the employer filled the position with a person not in the plaintiff's protected class, or the position remained open." *Mills*, 171 F.3d at 454.

Lupescu appears to argue that the fourth element essentially is not a part of the *prima facie* race discrimination claim, a view which none of his cited cases support and which the court declines to adopt.[7] Rather, reconciling the above-cited cases, a white

---

[7]   Lupescu's argument consists in part of a portion of the *Pantoja* opinion, inserted without quotation marks or citation to that case. (*See* Resp. 22.) In the portion of his argument where he does cite *Pantoja*, he does so for the proposition that "imposing a 'similarly situated' requirement, at least in a single plaintiff discharge case, is improper." (*Id.*) But even assuming *Pantoja*'s continued validity, it did not absolve Title VII termination plaintiffs from the fourth element of their *prima facie* claims; rather, *Pantoja* found that "similarly situated" was not the correct articulation of the fourth element, opting instead for the plaintiff's-replacement articulation discussed above. Given that the Seventh Circuit has repeatedly and more recently

Title VII plaintiff asserting a race discrimination claim arising from a termination can satisfy the fourth element of his *prima facie* case if he shows either that similarly situated employees were treated more favorably, that his employer sought someone not in the plaintiff's class to perform the plaintiff's work after the plaintiff was terminated, or that the position remained open. *See Henry v. Jones*, 507 F.3d 558, 565 (7th Cir. 2007) (making both inquiries in affirming summary judgment that plaintiff failed to satisfy his *prima facie* case). Lupescu makes no argument and points to no evidence that TSA found or sought to find anyone to take Lupescu's job after his termination, or that his position remained open, and so the only remaining inquiry is whether Lupescu was treated differently from similarly situated employees.

The parties disagree as to how widely to draw the "similarly situated" boundary. TSA urges that only other lead screeners on probationary status were similarly situated to Lupescu, while Lupescu urges that lead screeners and screeners (regardless of status) are all similarly situated. For purposes of a Title VII race discrimination claim, "similarly situated" employees are those who were "directly comparable" to the plaintiff "in all material respects." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005) (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)). "There is no precise formula" in determining which employees are similarly

---

reaffirmed the "similarly situated" requirement, the court finds that the plaintiff's-replacement inquiry from *Pantoja* to pose an alternative to the "similarly situated" requirement and not a replacement of it.

Lupescu discusses the "similarly situated" standard as applied to both race-discrimination and retaliation claims together. (*See* Resp. 22-24.) Lupescu does not explain how the "similarly situated" standard in retaliation claims informs that in race discrimination claims, particularly given that he apparently attempts to argue that the "similarly situated" standard is an element of pretext, when the above-cited cases make clear the standard is part of a *prima facie* race discrimination claim. The court will analyze the "similarly situated" standard for purposes of each of Lupescu's two claims separately, and as part of each *prima face* claim.

situated to the plaintiff, *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir.

2004), but the *Brummett* court explained that:

> To evaluate whether two employees are directly comparable, we consider all of the relevant factors, "which most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications-provided the employer considered the latter factors in making the personnel decision."

414 F.3d at 692-93 (quoting *Ajayi*, 336 F.3d at 532); *see also McDonald*, 371 F.3d at

1002-03; *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006).    None of

these factors is conclusive, for "'an employee need not show complete identity in

comparing himself to the better treated employee, but he must show substantial

similarity.'"    *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)

(quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).

Lupescu spends several pages arguing that the fourth element is essentially not a

part of the *prima facie* case, then makes just one citation to eight statements of fact, all

contested, to support his argument that he "has pointed to similarly situated employees

not in his protected class . . . who were treated more favorably . . . ."  (Resp. 24.)

Lupescu does not explain in any way how these employees were treated more favorably.

He explains how lead screeners like Lupescu and regular screeners were similarly

situated, but does not explain how a manager or supervisors, each of whom supervised

screeners of all ranks, are also comparable.  Aside from the above-quoted sentence, he

makes scarcely any argument explaining the records of other employees or his

interpretation of it.

Turning to the employees discussed in section I.D above, Laurent was a manager

and Chandler was a supervisor, and so were both superiors to Lupescu, who was a lead

screener.  In addition to failing even to argue that these two TSA employees were comparable to him, Lupescu has pointed to no evidence or legal authority that they were comparable.  The court cannot assume these three are comparable, given their different titles, different supervisory duties, and different superiors.  *See Goodwin v. Bd. of Trs. Of Univ. of Ill.*, 442 F.3d 611, 618 (7th Cir. 2006) (noting that employees senior to plaintiff did not deal with the same supervisor and so were not similarly situated).  Lupescu has failed to raise a triable issue of fact that he was similarly situated to either Laurent or Chandler.

That leaves Lupescu with three screeners: Chase, Hall, and Sims.  As noted above, Lupescu has not indicated whether any of these employees were probationary, nor has he produced evidence of what procedural barriers might have allowed non-probationary employees more disciplinary process than Lupescu received.  That alone might be sufficient to foreclose Lupescu's claims.  *See Steinhauer v. DeGolier*, 359 F.3d 481, 484-85 (7th Cir. 2004) (noting that probationary and non-probationary employees were not similarly situated); *see also Burks*, 464 F.3d at 751.  However, Lupescu contends that probationary employees were similarly situated to non-probationary employees, and some evidence in the record suggests TSA held all of its employees to similar disciplinary standards.  Even so, Lupescu has failed to carry his burden with respect to Chase and Hall.

Chase and Hall, like Lupescu, were terminated by TSA.  Lupescu does not explain how Chase and Hall were treated more favorably than Lupescu, given that they, like Lupescu, were terminated, and the court finds the evidence too inconclusive to allow for an inference that they were more leniently treated by the same supervisors.  All

available evidence suggests that Chase engaged in a multitude of misconduct during her tenure at TSA, and received progressive discipline up to her termination. The evidence also suggests that Chase did not report to Chandler, Laurent, or any of Lupescu's other supervisors or managers. Indeed, Bell and Greg Hansen, who neither party has identified, are the only common link between Chase's disciplinary records and Lupescu's. The evidence suggests that Bell knew of one minor episode of misconduct by Chase then, coming upon more evidence, moved to suspend then terminate her. While the Seventh Circuit has instructed that the "similarly situated" standard is a flexible one, *see South v. Ill. Environmental Protection Agency*, 495 F.3d 747, 752 (7th Cir. 2007), Lupescu has given the court no reason, apart from Chase's similar title, to find that she and Lupescu were similarly situated. In the absence of such an explanation, and given that Chase had different supervisors than Lupescu, there is insufficient evidence to create a triable issue of fact that she was similarly situated to him. Even assuming that Chase's and Lupescu's relevant supervisor is Bell, *see Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008), and not anyone below, the evidence suggests that Chase, like Lupescu, was suspended then terminated by Bell, apparently in much the same way Lupescu was. Therefore, there is insufficient evidence to support a finding that Chase was treated more favorably than Lupescu.

Lupescu presents evidence that Hall gave him "grief" when he asked her to help wand passengers, that he attempted to write her up, and that Chandler stopped him. TSA presents evidence that she was later terminated. (Def.'s Ex. 26.) Lupescu points to no other evidence regarding Hall's disciplinary record, and does not seek to explain how Hall was treated more favorably than he was. Lupescu also provides no other

explanation of the incident in question; "grief" is a vague term that could mean refusal, insubordination, or simply a bit of resistance. On such a thin record, the court cannot conclude that a triable issue of fact exists that Hall had a "comparable set of failings," *Henry*, 507 F.3d at 565, or that Hall was treated more favorably than Lupescu.

Sims, the remaining screener, was involved in an incident with Lupescu and Jeremy Dortch, who, like Lupescu, is white. (Pl.'s Stmt. of Add'l Facts ¶¶ 41-42.) Lupescu was monitoring a detector, through which Sims passed; Dortch admitted to striking the detector to set it off, either on accident or as a joke. According to contemporary disciplinary records offered by Lupescu, Dortch was "most responsible" for the incident; a TSA supervisor advised Bell and Jeanne Clark that Dortch's "unprofessional behavior should not be tolerated under any circumstances." (*Id.* at ¶ 42.) Despite these records, Lupescu, rather than Sims and Dortch, was pulled aside for counseling. Once pulled aside, Lupescu cursed audibly. (*Id.*)

Thus, Dortch, a white TSA employee most responsible for the incident whose discipline had been recommended, and Sims, an African-American employee whose responsibility for the incident is unclear, were not disciplined while Lupescu, a white TSA employee, whose responsibility for the incident is unclear, was disciplined. That Dortch, the person most responsible for the incident and the person that the investigating supervisor suggested be disciplined, is white but was not disciplined, casts doubt on any alleged discriminatory motive of discrimination arising from this specific incident. But TSA has cited no authority holding that its decision not to punish Dortch nullifies the disparity between its treatment of Sims, who may be a comparator, and Lupescu, and the court's survey of Seventh Circuit precedent reveals no such authority.

In fact, TSA does not argue that Dortch's involvement in but absolution for the alleged incident had any effect on the Sims-Lupescu comparison. Rather, TSA argues that the evidence indicates that Sims was involved only in one incident, while, according to TSA, Lupescu was involved in far more. This argument fails in two respects. First, TSA's records–the basis for its argument regarding Lupescu's misconduct–are inadmissible at this stage for the truth of the matters asserted therein, and so do not establish as a matter of law that Lupescu engaged in all of the conduct TSA asserts. Second, TSA ignores that in the single incident in which Sims was involved, evidence supports a finding that she was treated more favorably than Lupescu.

In sum, Lupescu has identified Sims as a similarly situated non-white employee who was treated more favorably than he, as described above. Lupescu has therefore established genuine issues of material fact supporting each element of his *prima facie* case.

>        5.        Legitimate, Nondiscriminatory Reasons

TSA argues that even if Lupescu has established a triable issue on his *prima facie* case, it had a legitimate, non-discriminatory reason for firing him. According to TSA, Lupescu was not meeting TSA's expectations, and so TSA terminated him pursuant to its policy allowing the termination of probationary employees like Lupescu for any reason. However, as explained above, TSA has failed to establish that Lupescu was not meeting its expectations as a matter of law; his conduct is largely inconclusive once his records are excluded. Moreover, TSA has pointed to no authority holding that "any reason" could include a discriminatory one, and, as noted above, triable issues of fact exist regarding whether Lupescu was fired for a discriminatory reason.

Lupescu has established triable issues of fact regarding each element of his *prima facie* case, and TSA has not established that it fired Lupescu for legitimate, non-discriminatory reasons as a matter of law.

**B.     Retaliation**

Lupescu also asserts that TSA retaliated against him once he reported sexual harassment, a claim on which TSA also seeks summary judgment. Title VII prohibits retaliation against employees who have opposed unlawful employment practices, such as discrimination or harassment.   The Seventh Circuit has described retaliation claims as follows:

> A *prima facie* case of retaliation may be made directly or indirectly. Under the direct method, a plaintiff must show (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by the employer; and (3) a causal connection between the two. *Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 903 (7th Cir. 2005). Under the indirect method, plaintiff must show that she (1) engaged in statutorily protected expression, (2) met the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected expression. *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 663 (7th Cir. 2006).

*Kodl v. Bd. of Educ.*, 490 F.3d 558, 562 (7th Cir. 2007); *see also Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008); *Stone v. City of Indianapolis Public Utils. Div.*, 281 F.3d 640 (7th Cir. 2002).

1.     Direct method

Lupescu asserts that he engaged in statutorily protected activity when he complained of harassment and discrimination on December 20, 2002, February 6, 2003, and February 19, 2003.  Each date requires an examination of whether an issue of fact exists that Lupescu's asserted complaint rises to the level of protected activity, and that a

causal connection exists between his complaints and any adverse employment actions he may have suffered.

First, Lupescu's testimony suggests that he complained to Bell on December 20 generally regarding harassment, which is insufficient to constitute protected activity. *Kodl*, 490 F.3d at 563. Even assuming that this complaint and Lupescu's asserted complaint to Laurent on December 20 the same day constituted protected activity, though, Lupescu's disciplinary record dated that same day does not suggest it was written by Laurent or Bell (in fact, no record of conduct was signed by Laurent or Bell), and Lupescu points to no evidence suggesting that whoever did write it was aware of Lupescu's complaints. Even if there were such evidence, the only basis for a causal connection between the complaint and Lupescu's record of conduct would be temporal proximity, which, standing alone, does not establish sufficient causation to survive summary judgment. *See Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 751 (7th Cir. 2009).

Lupescu next asserts that there is evidence that he complained of harassment at a February 6, 2003 meeting; his testimony establishes only that he asked how employees should report a manager's harassment, given that employees were generally told to report harassment to their respective managers. Even if Lupescu's question were a generalized complaint of harassment (which, even construed in Lupescu's favor, is far from clear), such a generalized complaint would not rise to the level of protected activity. *Kodl*, 490 F.3d at 563.

Last, Lupescu claims that he complained of discrimination and harassment by Laurent and Ferba in his meeting with Arthur Bell on February 19, 2003, and was

suspended soon thereafter.  Lupescu points to no admission from Bell or any other TSA employee that Lupescu was terminated because of this complaint.  *See Caskey*, 535 F.3d at 593.  Without that admission, Lupescu must show that a question of fact exists regarding causation "'by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Daugherty*, 577 F.3d at 751 (quoting *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008) (internal quotation marks and citation omitted)).  "The circumstantial evidence, however, 'must point directly to a discriminatory reason for the employer's action.'" *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Adams v. Wal-Mart Stores, Inc.*, 359 F.3d 498, 54 (7th Cir. 2004)).

Lupescu argues that the temporal proximity between his complaint and his suspension would allow a jury to infer such intentional discrimination.  But, as noted above, the Seventh Circuit "has held repeatedly that temporal proximity alone is not sufficient to withstand summary judgment." *Dougherty*, 577 F.3d at 751-52 (collecting cases).  However, the evidence presented also suggests that Bell knew of Lupescu's protected activity when Bell decided[8] to terminate Lupescu.  The Seventh Circuit has noted that, while temporal proximity alone is insufficient, "When an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied." *Culver v. Gorman &*

---

[8] Lupescu states facts here that Bell "initiated [his] termination papers," and, in seeking to establish "background circumstances" to support his discrimination claim, that Laurent "recommended [his] termination." (Pl.'s Stmt. of Add'l Facts ¶¶ 45, 51.)  In other words, Lupescu seeks to create a triable issue of fact that both Bell and Laurent were responsible for his termination. (*See id.* 18.)  As the court noted above, the record is unclear as to whether Bell or Laurent was the ultimate decision-maker and, taking all inferences in Laurent's favor, the two arguments are not entirely inconsistent.

*Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (quoting *Lalvani v. Cook County, Ill.*, 269 F.3d 785, 790 (7th Cir. 2001)). A triable issue of fact exists that Lupescu engaged in protected activity and that Bell decided to terminate Lupescu immediately after and with knowledge of that activity. TSA has not presented evidence or argument of why this is the atypical case. TSA's motion for summary judgment is therefore denied with respect to Lupescu's retaliation claim by the direct method.

2. Indirect method

However, should this case proceed to trial, Lupescu cannot seek to prove his case by the indirect method because he has no evidence of similarly situated employees who did not engage in protected activity. Lupescu relies on the same comparators first asserted in his racial discrimination claim. This reliance is doubly flawed. First, the evidentiary gaps in Lupescu's race discrimination "similarly situated" claim doom most of this claim as well: there is no evidence that Laurent, Chandler, or Chase was comparable to Lupescu, and likewise none that Chase or Hall was treated more favorably. Second, and equally fundamentally, Lupescu points to no evidence that any purported comparator did not engage in protected activity. Lupescu must produce evidence creating a triable issue of fact that the comparators did not engage in such conduct, *see Bellino v. Peters*, 530 F.3d 543, 551 (7th Cir. 2008) (holding that plaintiff was not similarly situated to another employee who also engaged in protected activity for purposes of plaintiff's retaliation claim); without that evidence, the court is left to speculate. Because Lupescu has not presented any evidence that similarly situated TSA employees who did not engage in protected activity were treated more favorably than he was, his retaliation claim by the indirect method is barred.

3.      Legitimate, Nondiscriminatory Reasons

TSA summarily reincorporates its argument from Lupescu's racial discrimination claim that it had legitimate, nondiscriminatory reasons for firing Lupescu. This argument fails; there is insufficient evidence that Lupescu was not satisfying TSA's expectations, or indeed what TSA's expectations were. Moreover, while Lupescu was certainly a probationary employee possibly subject to termination for any reason, there is conflicting evidence regarding whether Lupescu was supposed to receive progressive discipline, and "any reason," even if he was a probationary employee, could not be discriminatory.

## IV.   CONCLUSION

For the reasons stated above, TSA's motion for summary judgment is denied.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 19, 2010